JASON R. HULL [11202]
JHULL@MOHTRIAL.COM
**MARSHALL OLSON & HULL, PC**
TEN EXCHANGE PLACE, SUITE 350
SALT LAKE CITY, UTAH 84111
TELEPHONE: 801.456.7655

JAMES J. ROSEMERGY*
JROSEMERGY@CAREYDANIS.COM
**CAREY & DANIS, LLC**
8235 FORSYTH, SUITE 1100
ST. LOUIS, MO 63105
TELEPHONE: 314.725.7700

ATTORNEYS FOR PLAINTIFF AND PROPOSED
CLASS

\* *PRO HAC VICE* FORTHCOMING

BEENA M. MCDONALD*
BMM@CHIMICLES.COM
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
ONE HAVERFORD CENTRE
361 W. LANCASTER AVENUE
HAVERFORD, PA 19041
TELEPHONE: 610.642.8500

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| KRISTI SARKIS, on behalf of herself, her minor child G.S., and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSTRUCTURE, INC.,<br><br>Defendant | **COMPLAINT**<br>**[PROPOSED CLASS ACTION]**<br><br>JURY TRIAL DEMANDED<br><br>Case No. 2:26-cv-380 |

1

Plaintiff Kristi Sarkis, on behalf of herself, her minor child G.S., ("Plaintiff"), and all others similarly situated, brings this Class Action Complaint against Instructure, Inc. ("Instructure" or "Defendant"), and alleges as follows, based upon personal knowledge as to herself and her child, and upon information and belief as to all other matters, including the investigation of counsel and review of publicly available information:

## I. NATURE OF THE ACTION

1.      This is a class action arising from one of the largest data breaches ever to affect students, teachers, and educational staff in the United States. On information and belief, between approximately April 25, 2026 and April 30, 2026, an unauthorized criminal threat actor exploited a vulnerability in Defendant's Canvas learning management system ("Canvas") and exfiltrated approximately 3.65 terabytes of personal information belonging to approximately 275 million students, teachers, and staff at nearly 9,000 educational institutions worldwide (the "Data Breach").[1]

2.      Defendant has confirmed that the compromised information includes names, email addresses, student identification numbers, and the contents of private communications between students, between students and teachers, and among other Canvas users (collectively, "PII"[2] or "Private Information").[3] On information and belief, much of this Private Information was generated by, or relates to, minor children and is protected by federal and state laws governing the

[1] https://mashable.com/article/instructure-canvas-edtech-data-breach-shinyhunters (last visited May 6, 2026).

[2] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[3] https://status.instructure.com/incidents/9wm4knj2r64z (last visited May 6, 2026).

privacy of student educational records.

3.      Canvas is the dominant learning management system in the United States. It is used by more than 40% of higher education institutions in North America and by thousands of K-12 school districts, including Plaintiff's child's school in the State of Kansas.[4] For tens of millions of American students, including G.S., use of Canvas is not optional: it is the platform through which schools deliver coursework, assignments, grades, and day-to-day communications with teachers.

4.      Defendant held itself out as a trusted custodian of student educational records. Its public-facing materials emphasized its compliance with the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501–6506, and applicable state student privacy laws. Defendant promised, expressly and impliedly, to safeguard the Private Information entrusted to it.

5.      Defendant broke those promises. Defendant failed to implement reasonable, industry-standard data security measures appropriate to the volume, sensitivity, and special legal status of the data in its custody. As a result, the criminal extortion group commonly known as "ShinyHunters" was able to access Defendant's systems, exfiltrate billions of private student communications, and publish a ransom demand on its public leak site — threatening, in plain English, to release the data of nearly 9,000 schools and 275 million users unless Defendant paid.[5]

6.      This was not Defendant's first breach. Approximately eight months earlier, in September 2025, the same threat actor — ShinyHunters — successfully compromised Defendant's

---

[4] https://formswrite.com/blog/what-is-canvas-lms-complete-guide-for-educators (last visited May 6, 2025).
[5] https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach/ (last visited May 6, 2026).

Salesforce environment through a social-engineering attack. Defendant publicly acknowledged that breach but despite its awareness of past security lapses and the fact that it was, in fact, the target of bad actors, Defendant nevertheless failed to implement security controls sufficient to prevent ShinyHunters from breaching its systems *again*.[6] The Data Breach is therefore not a one-time misfortune; it is the predictable consequence of repeated, deliberate underinvestment in data security by an enterprise entrusted with the records of hundreds of millions of students.

7.      Defendant's response compounded the harm. Defendant detected service disruptions on April 30, 2026 but as of the filing of this Complaint has not provided individualized notice to G.S., to Plaintiff, or, on information and belief, to the vast majority of affected Class Members (defined below). The notification delay exposed Plaintiff and the Class to ongoing risk of phishing, social engineering, identity theft, and impersonation — risks that are particularly acute for minor children whose Private Information can be exploited for years before detection.

8.      G.S. is a 15-year-old student in the state of Kansas who was required by his school to use Canvas as the principal channel for receiving assignments, submitting work, and communicating with teachers and classmates. G.S.'s school is among the institutions identified as affected by the Data Breach. As a direct and proximate result of Defendant's conduct, G.S.'s name, school email address, student identification number, and private communications with teachers and classmates were exposed to a criminal threat actor and remain at imminent risk of public release, either now or at some point in the future.

9.      Plaintiff brings this action on behalf of herself and a nationwide Class of similarly

---

[6] https://hackread.com/shinyhunters-instructure-canvas-lms-vimeo-data-breach/ (last visited May 6, 2026).

situated individuals, seeking damages, equitable relief, and injunctive relief to compel Defendant to adopt reasonable data security practices, to provide adequate notice and credit and identity-monitoring services, and to compensate Class Members for the substantial harm Defendant's conduct has caused.

## II. JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000; the proposed Class consists of more than 100 members; and at least one Class Member is a citizen of a State different from Defendant.

11.    This Court has personal jurisdiction over Defendant because Defendant maintains its headquarters in this district. Defendant is therefore "at home" in this District for purposes of general personal jurisdiction.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District for venue purposes. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including corporate decisions concerning Defendant's data security policies and the legal status of Defendant's relationships with its customers.

## III. PARTIES

### A.  Plaintiff

13.    Plaintiff Kristi Burdette Sarkis is the parent and natural guardian of G.S., a 15-year-old minor child. Plaintiff and G.S. reside in Shawnee, Kansas.  Plaintiff brings this action on her own behalf and as parent and next friend of G.S. pursuant to Federal Rule of Civil Procedure 17(c).

G.S. is a pseudonym used to protect the identity of a minor; Plaintiff has filed contemporaneously with this Motion to Appoint Next Friend.

14.     G.S. is a high school student in the state of Kansas. G.S.'s school requires students to use Canvas to access course materials, submit assignments, view grades, and communicate with teachers. G.S. has used Canvas continuously during the school year. In the course of that use, G.S.'s name, school-issued email address, student identification number, and private messages with teachers and classmates were transmitted to and stored by Defendant.

15.     On information and belief, G.S.'s school is among the educational institutions using Canvas who had data exfiltrated during the Data Breach. As a direct and proximate result of Defendant's conduct, G.S.'s Private Information has been compromised. G.S. and Plaintiff have suffered and will continue to suffer the injuries described herein, including imminent and substantially heightened risk of identity theft and fraud, lost time and effort responding to the breach, diminution in value of the Private Information, and loss of privacy.

**B.  Defendant**

16.     Defendant Instructure, Inc. is a corporation organized under the laws of the State of Delaware, with its headquarters and principal place of business at 6330 South 3000 East, Suite 700, Salt Lake City, Utah 84121. Defendant is the developer, owner, and operator of the Canvas learning management system.

17.     Defendant is a citizen of Delaware and Utah. Defendant transacts substantial and continuous business throughout the United States, including in this District, by licensing Canvas and related services to thousands of educational institutions and by collecting, processing, and storing Private Information from tens of millions of American students, teachers, and staff.

6

## IV. FACTUAL ALLEGATIONS

### A. Defendant's Business and the Sensitivity of the Data It Collects

18.  Defendant operates Canvas, the leading learning management system in the United States. Canvas is used by more than 40% of higher education institutions in North America and by thousands of K-12 school districts, representing millions of students, teachers, and school administrators.[7]

19.  To use Canvas, students, teachers, and staff are required to provide and generate a wide range of personal information. This information includes, at a minimum: full names, email addresses (including school-assigned addresses that frequently incorporate the user's real name), student identification numbers, course enrollment information, and the substantive content of communications among users.

20.  The Canvas Inbox feature functions as a private messaging system. Through it, students communicate with teachers about academic difficulties, mental health concerns, accommodations, family circumstances, and other sensitive matters. Students communicate with one another about coursework, social relationships, and personal issues. On information and belief, the contents of these messages — amounting, by ShinyHunters' own description, to "several billions of private messages" — were exfiltrated in the Data Breach.

21.  Information transmitted through Canvas constitutes "education records" within the meaning of FERPA, 20 U.S.C. § 1232g(a)(4)(A), to the extent that records are maintained by a covered educational agency or institution or by a party acting for such agency or institution. As a

---

[7] https://onedtech.philhillaa.com/p/state-of-lms-market-us-canada-year-end-2023?utm_source=copilot.com (last visited May 6, 2026).

vendor that processes such records on behalf of educational institutions, Defendant has long acknowledged — in marketing materials, in contracts with school customers, and in public-facing privacy disclosures — that it functions as a "school official" for purposes of the FERPA "school official" exception, 34 C.F.R. § 99.31(a)(1)(i)(B), and that it is bound by FERPA's confidentiality requirements with respect to the data in its custody.

22.    A substantial portion of Defendant's users are minor children. Canvas is used in K-12 districts across the country. As to those users, Defendant is also subject to the requirements of COPPA, 15 U.S.C. §§ 6501–6506, and to a wide range of state student privacy statutes.

23.    Defendant has publicly held itself out as a trusted steward of this data. Defendant's privacy policies and security disclosures represent that Defendant maintains "industry-standard" administrative, physical, and technical safeguards designed to protect personal information from unauthorized access, use, or disclosure.

24.    Defendant's sophisticated institutional customers paid Defendant substantial license fees in reliance on those representations. Those institutions, in turn, required their students — including G.S. — to use Canvas. The students themselves had no meaningful ability to negotiate, opt out, or withhold their data; for them, use of Canvas was a condition of receiving an education.

B. *Defendant's September 2025 Breach by the Same Threat Actor*

25.    In or around September 2025, Defendant suffered a data breach affecting its corporate Salesforce environment (the "2025 Breach"). Defendant publicly disclosed the 2025 Breach. Defendant attributed the 2025 Breach to a social-engineering attack by a criminal threat

actor.[8]

26. On information and belief, the threat actor responsible for the 2025 Breach was ShinyHunters — the same threat actor responsible for the Data Breach at issue in this Complaint.

27. The 2025 Breach put Defendant on direct, actual notice that (a) it was a target of organized criminal threat actors, (b) ShinyHunters specifically had successfully compromised Defendant's systems, and (c) Defendant's existing security posture — including its access controls, credential management, monitoring, and incident response — was inadequate to prevent unauthorized access to its data environments.

28. A reasonable enterprise of Defendant's size, sophistication, and sensitivity, having been breached by a known criminal extortion group, would have undertaken a comprehensive review and hardening of its data security posture, including but not limited to: enhanced credential management; rotation of API keys; implementation of multifactor authentication on all privileged access; comprehensive logging and anomaly detection; segmentation of customer data environments from corporate environments; and periodic third-party penetration testing focused specifically on the techniques known to be used by ShinyHunters.

29. Defendant did not do so, or did not do so adequately. Less than eight months later, ShinyHunters again compromised Defendant's systems — this time, exfiltrating the data of approximately 275 million users worldwide. Defendant's failure to remediate after the 2025 Breach is, in itself, an independent and aggravating breach of the duty of care Defendant owed to Plaintiff, G.S., and the Class.

---

[8] https://securityboulevard.com/2026/05/edtech-firm-instructure-discloses-cyber-incident-probes-impact/?utm_source=copilot.com (last visited May 6, 2026).

### C. The April-May 2026 Data Breach

30.    On April 30, 2026, Defendant's public-facing status page reported disruptions to "tools relying on API keys." On information and belief, those disruptions were the visible symptoms of an active intrusion already underway in Defendant's systems.[9]

31.    On May 1, 2026, Defendant publicly acknowledged that it was the target of a cybersecurity incident "perpetrated by a criminal threat actor" and that it had retained outside forensic experts.

32.    On May 2, 2026, Defendant updated its disclosure to state that the incident had been "contained" and that the affected information "consists of certain identifying information of users at affected institutions, such as names, email addresses, and student ID numbers, as well as messages among users."

33.    On May 3, 2026, ShinyHunters publicly listed Defendant on its dark-web data leak site. The listing claimed that the threat actor had exfiltrated 3.65 terabytes of data, encompassing the records of approximately 275 million students, teachers, and staff at nearly 9,000 educational institutions, including "several billions of private messages among students and teachers and students and other students." ShinyHunters issued a public ransom demand: pay, or the data would be leaked.

34.    On or about May 5, 2026, ShinyHunters shared with information security journalists, and posted on its data leak site, a list identifying approximately 8,809 educational institutions — including school districts, colleges, and universities — whose Canvas instances were allegedly compromised, with per-institution record counts ranging from tens of thousands to

---

[9] *Id.*

several million.[10]

35.     ShinyHunters has stated publicly that the Data Breach was carried out by exploiting a vulnerability in Defendant's systems, which has now been patched. Independent reporting has confirmed that samples of the stolen data, reviewed by reputable security journalists, contain real names, email addresses, and phone numbers of individual users — corroborating the claim that the data was actually exfiltrated and is in the hands of the threat actor.

36.     ShinyHunters is a known criminal extortion group with a documented history of leaking data publicly when its ransom demands are not met. The risk that the Private Information of Plaintiff, G.S., and the Class will be released onto criminal forums is not speculative; it is imminent.

**D.   *The Sensitivity of the Compromised Data and the Particular Vulnerability of Minor Children***

37.     The Private Information compromised in the Data Breach is highly sensitive. Names and school-issued email addresses, combined with student identification numbers and the contents of private messages, can be used by criminals to construct extraordinarily convincing phishing and social-engineering attacks targeted at students and their families. A criminal armed with the contents of a student's private communications with a teacher — including references to specific assignments, deadlines, classmates, and personal circumstances — can craft messages indistinguishable from legitimate school correspondence.

38.     These risks are particularly acute for minor children. Minors generally have unused Social Security numbers and clean credit files. Identity thieves prize the data of minors precisely

---

[10] *See, e.g.,* https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/ (last visited May 5, 2026).

11

because compromised records can be exploited for years before detection — most often only when the minor reaches adulthood and applies for credit, financial aid, or employment.

39.     The compromised messages may also reveal sensitive information that is not, on its face, classically "identifying" — information about a student's mental health, learning differences, family circumstances, disciplinary issues, sexual orientation, or political beliefs. The disclosure of such information to a criminal threat actor, and its threatened public release, is itself a serious privacy injury.

40.     On information and belief, the Private Information compromised in the Data Breach has commercial value on criminal forums. Comprehensive personal information packages, particularly those involving minors, are routinely advertised and sold on dark-web marketplaces, with prices reflecting the long-term utility of the underlying data.

### E.  Risks of Inadequate Are Well-Known

41.     The market for stolen personal information is well-documented and active. Criminal actors who obtain personal data through breaches routinely monetize it through dark-web forums and marketplaces that operate beyond the reach of conventional law enforcement. These markets — of which law enforcement agencies have publicly identified and periodically dismantled numerous examples — facilitate the sale of stolen credentials, financial account information, and identity packages at prices that reflect the long-term utility of the underlying data. Individual identity records have been documented selling for anywhere from $40 to over $350 per record, with comprehensive profiles yielding higher prices. Access to entire corporate data breach datasets has been advertised for prices ranging from hundreds to thousands of dollars, depending on the volume and sensitivity of the data involved.

12

42. The financial consequences of this underground market are substantial and broadly documented. The Federal Bureau of Investigation's Internet Crime Complaint Center has reported that internet-enabled crimes — including those made possible by stolen personal information — have generated billions of dollars in annual losses to individual and business victims. Federal law enforcement has further noted that early notification of victims is critical because prompt action can prevent fraudulent transactions from being completed; Defendant's failure to provide timely individualized notice deprived Plaintiff, G.S., and the Class of precisely that opportunity.

43. The Private Information compromised in the Data Breach is not merely at risk of misuse — it has been permanently diminished in value as a species of personal property. Personal data has recognized economic value in legitimate markets: companies in the business of data aggregation and analytics generate hundreds of billions of dollars annually by collecting, packaging, and selling consumer information. When that information is stolen and publicly exposed, its scarcity and exclusivity are destroyed, its control is transferred without consent, and its owner receives nothing in return. Plaintiff and the Class conferred this property on Defendant under the reasonable expectation that it would be protected; instead, it was compromised and its value dissipated, causing a concrete and measurable economic injury independent of any downstream fraud.

44. The Data Breach was preventable. The class of attack that ShinyHunters carried out against Defendant — exploitation of authenticated access to a sensitive cloud data environment, followed by large-volume exfiltration through legitimate API channels and an extortion demand — has been the subject of repeated, public, and detailed warnings from federal cybersecurity authorities for years. The methods to defend against it are well understood, broadly available, and

within the operational and financial means of any enterprise of Defendant's scale.

45.     The U.S. Cybersecurity and Infrastructure Security Agency ("CISA"), together with the Federal Bureau of Investigation, the National Security Agency, and the Multi-State Information Sharing and Analysis Center, jointly publish and regularly update the #StopRansomware Guide, a comprehensive set of best practices for preventing and responding to ransomware and data extortion incidents. The Guide is freely available, expressly intended for organizations of every size and sector, and aligned with CISA's Cross-Sector Cybersecurity Performance Goals — themselves derived from the National Institute of Standards and Technology Cybersecurity Framework. Among the prevention practices the Guide identifies as foundational are: enforcing phishing-resistant multifactor authentication on privileged and remote access; applying the principle of least privilege across users, services, and machine accounts (including API tokens and service-account credentials); maintaining inventory and rotation of secrets, keys, and tokens; segmenting customer data environments from corporate environments and from one another; deploying network and endpoint monitoring sufficient to detect anomalous data access and large-volume egress; logging and retaining authentication and data-access events at a granularity sufficient to support detection and forensic reconstruction; promptly applying security updates to internet-facing assets; and conducting regular vulnerability scanning and red-team exercises against externally exposed systems.

46.     The CISA Guide further recognizes — and emphasizes after each successive update — that "double extortion" attacks, in which threat actors exfiltrate data and then threaten to publish it absent a ransom payment, have become the dominant operational model of organized cybercriminals. Defenses against this specific threat model do not require novel technology; they

14

require disciplined execution of the practices identified above, particularly with respect to identity, access, and egress monitoring. Defendant, which holds the educational records and private communications of approximately 275 million individuals, was a paradigmatic candidate for exactly this threat model and bore a corresponding obligation to harden its environment accordingly.

47.    Independent industry frameworks reinforce the same expectations. The Center for Internet Security's Critical Security Controls (the "CIS Controls"), the NIST Cybersecurity Framework Version 2.0, and NIST Special Publication 800-53 Revision 5 each specify, in greater detail than the CISA Guide, the technical and administrative safeguards expected of an enterprise that processes sensitive personal information at scale. These frameworks have been recognized by federal regulators, courts, and state attorneys general as benchmarks for "reasonable" data security. On information and belief, Defendant failed to satisfy minimum requirements of one or more of these frameworks, including but not limited to controls governing identity and access management (NIST CSF 2.0 controls PR.AA-01 through PR.AA-05), data security and protection (PR.DS-01, PR.DS-02, and PR.DS-10), platform and configuration management (PR.PS-01, PR.PS-02, and PR.PS-05), and continuous monitoring and detection (DE.CM-01, DE.CM-03, DE.CM-06, and DE.CM-09).

## F.  *Defendant's Inadequate Security Practices*

48.    Defendant's security failures fell well below the standards reasonably expected of an enterprise of its size, sophistication, and data sensitivity. On information and belief, Defendant failed to: (a) implement and enforce reasonable access controls, including least-privilege principles, on systems containing student data; (b) implement and enforce multifactor

authentication on all privileged accounts and API integrations; (c) properly rotate, scope, and monitor API keys, particularly following the September 2025 Breach; (d) maintain effective intrusion detection and anomaly monitoring sufficient to detect a multi-day exfiltration of 3.65 terabytes of data; (e) segment customer data environments from corporate environments; (f) implement reasonable encryption and tokenization of sensitive data at rest; (g) conduct rigorous third-party penetration testing focused on the techniques used by known threat actors targeting Defendant; and (h) timely remediate the security vulnerabilities exposed by the 2025 Breach.

49.     Defendant's failures occurred against a backdrop of well-publicized warnings. The education-technology sector has been a prime target for cybercriminals throughout 2025 and 2026. PowerSchool, another major educational vendor, disclosed a breach in January 2025 affecting approximately 62 million students. Infinite Campus disclosed a breach involving the same threat actor responsible for the Data Breach. The Federal Trade Commission settled with Illuminate Education in late 2025 over an earlier student data breach. The risks were neither novel nor unforeseeable.

50.     Defendant's data security practices also fell below the standards established by widely accepted frameworks, including the National Institute of Standards and Technology Cybersecurity Framework ("NIST CSF") and the NIST Special Publication 800-53 controls. Federal regulators, including the Federal Trade Commission, have repeatedly recognized these frameworks as benchmarks for reasonable data security.

51.     The fact that ShinyHunters successfully exfiltrated 3.65 terabytes of data from Defendant's environment over multiple days, using credentials and access pathways that did not generate a timely or effective response, is itself evidence that Defendant did not implement these

16

widely available controls in a manner sufficient to fulfill its obligations to Plaintiff and the Class. That conclusion is reinforced — independently and powerfully — by the fact that the same threat actor had already breached Defendant only eight months earlier, providing Defendant with both actual notice of its inadequate security posture and a roadmap of the specific tactics it needed to defend against. A reasonable enterprise, having received that warning, would have closed those gaps. Defendant did not.

### G. Defendant's Inadequate Notice and Response

52.     Defendant's post-breach response has further harmed Plaintiff and the Class. Defendant has not provided individualized notice to affected users. Instead, Defendant has issued generic public statements through corporate channels, leaving notification to the affected institutions — many of which themselves do not yet know the scope of their exposure or the identities of all affected users.

53.     Defendant has not offered Plaintiff, G.S., or the Class any credit monitoring, identity-theft monitoring, dark-web monitoring, or identity-restoration services. Defendant has not committed to bearing the cost of remedial measures over a period commensurate with the long-term risks of the Data Breach, particularly the risks to minor children.

54.     Defendant's sparse, generalized, and delayed disclosures violate the prompt-notice obligations imposed by numerous state data breach notification statutes.

### H. Plaintiff's and G.S.'s Injuries

55.     As a direct and proximate result of Defendant's conduct, Plaintiff and G.S. have suffered and will continue to suffer concrete and particularized injuries, including but not limited to:

17

   a.  imminent and substantially heightened risk of identity theft, financial fraud, and impersonation;

   b.  actual loss of privacy as a result of the unauthorized exfiltration of G.S.'s Private Information, including the contents of private school communications;

   c.  lost time and effort responding to the Data Breach, including time spent investigating the breach, reviewing notices and news reports, monitoring accounts, and adopting protective measures;

   d.  out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and unauthorized use of G.S.'s Private Information;

   e.  diminution in value of the Private Information that G.S. was required to provide as a condition of accessing his education;

   f.  anxiety, distress, and concerns about the long-term consequences of the breach for a minor child; and,

   g.  deprivation of the value of the data security promised by Defendant and impliedly paid for through institutional license fees.

56. The injuries described above are not speculative, and the burden of responding to them is both real and well-recognized. Federal authorities have long acknowledged that victims of data breaches face substantial, ongoing costs — in time, money, and effort — to protect themselves from identity theft and fraud. The U.S. Government Accountability Office has documented that identity theft victims confront significant financial losses and must invest considerable time and resources to restore their credit standing and good name, often over a period of years. These costs fall on victims regardless of whether actual fraud has yet occurred, because the risk alone requires

immediate and sustained defensive action.

57.    The Federal Trade Commission advises data breach victims to take a series of protective steps that are time-consuming and, in many cases, financially costly: placing fraud alerts and extended fraud alerts with the major credit bureaus; reviewing credit reports across multiple reporting agencies; initiating credit freezes and, where necessary, lifting them when applying for credit or housing; contacting financial institutions and service providers to identify and contest unauthorized transactions; and, for those who experience actual identity theft, filing formal identity theft reports and working through the process of correcting affected accounts. Each of these steps takes time that Plaintiff and G.S. — and each member of the Class — are required to spend as a direct consequence of Defendant's failure to protect their data. For minor children, the monitoring obligation extends not just months but years, through and potentially past the age of majority, compounding the burden on their families.

58.    Accordingly, the injuries identified herein are concrete, particularized, and traceable to Defendant's conduct. Far from being merely potential injuries, they are the predictable, near-certain consequences of a 3.65-terabyte exfiltration by a known criminal extortion group with a documented practice of publicly releasing stolen data.

## V. CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), individually and on behalf of the following Classes:

> **Nationwide Class:** All persons residing in the United States whose Private Information was compromised in the Data Breach.

> **Minor Subclass:** All persons residing in the United States who, at the time of the Data Breach, were under the age of 18 and whose Private Information was compromised in the Data Breach (the "Minor

Subclass").

60.    Together, the Nationwide Class and the Minor Subclass are referred to herein as the "Class."

61.    Excluded from the Class are: (a) Defendant, its officers, directors, employees, subsidiaries, affiliates, and successors; (b) the judge and magistrate judge presiding over this action and members of their immediate families and judicial staff; and (c) any persons who timely opt out of the Class.

62.    Plaintiff reserves the right to amend the Class definitions, including to add or modify subclasses, as discovery proceeds and the contours of the Data Breach become better understood.

63.    *Numerosity — Fed. R. Civ. P. 23(a)(1):* The Class is so numerous that joinder is impracticable. On information and belief, the Nationwide Class consists of tens of millions of members; the Minor Subclass consists of hundreds of thousands of members at minimum. The exact number and identities of Class Members are within Defendant's exclusive knowledge and control and can be determined from Defendant's records.

64.    *Commonality — Fed. R. Civ. P. 23(a)(2):* There are numerous questions of law and fact common to the Class, including without limitation:

    a.    whether Defendant owed a duty to Plaintiff and the Class to implement reasonable data security practices;

    b.    whether Defendant breached that duty;

    c.    whether Defendant's data security practices were unreasonable in light of the size and sensitivity of the data in its custody and the warnings provided by the

20

September 2025 Breach;

d.  whether Defendant's conduct violated the Federal Trade Commission Act and analogous state consumer protection statutes;

e.  whether Defendant's conduct constituted a breach of implied contract and/or breach of confidence;

f.  whether Defendant has been unjustly enriched at the expense of Plaintiff and the Class;

g.  whether Defendant timely and adequately notified affected persons of the Data Breach as required by applicable state law;

h.  whether the Class is entitled to actual, statutory, and/or punitive damages; and

i.  whether the Class is entitled to declaratory and injunctive relief, including the imposition of reasonable data security practices and the provision of credit and identity monitoring services for a period commensurate with the long-term risks of the Data Breach.

65.    *Typicality — Fed. R. Civ. P. 23(a)(3):* Plaintiff's claims are typical of those of the Class. Plaintiff and the Class were all subject to the same data security practices of Defendant, all entrusted Private Information to Defendant in the same manner, all had their Private Information compromised in the same Data Breach, and all sustained injuries arising from the same course of conduct by Defendant. Plaintiff's claims arise from the same legal theories as those of the absent Class Members.

66.    *Adequacy — Fed. R. Civ. P. 23(a)(4):* Plaintiff is an adequate representative of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the absent Class

21

Members. Plaintiff has retained counsel with substantial experience prosecuting consumer class actions, including data privacy and data breach class actions. Counsel is committed to vigorously prosecuting this action.

67. ***Predominance and Superiority — Fed. R. Civ. P. 23(b)(3):*** The questions of law and fact common to the Class predominate over any questions affecting only individual members. Defendant's data security practices were uniform across the Class. The existence and adequacy of those practices, Defendant's breach of duty, and Defendant's violation of state consumer protection statutes can be proved on a class-wide basis.

68. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members, while real, are small in relation to the expense and burden of individual litigation. It would be virtually impossible for the vast majority of Class Members to seek redress on an individual basis. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would entail.

69. ***Injunctive and Declaratory Relief — Fed. R. Civ. P. 23(b)(2):*** Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole. Class certification under Rule 23(b)(2) is appropriate as to Plaintiff's claims for declaratory and injunctive relief.

70. ***Issue Class — Fed. R. Civ. P. 23(c)(4):*** In the alternative, the Court may certify particular issues for class treatment under Rule 23(c)(4), including without limitation the existence

and scope of Defendant's duty of care, breach of that duty, the fact of injury, and Defendant's liability.

## VI. CAUSES OF ACTION

## COUNT I

### Negligence

71.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72.     Defendant owed Plaintiff and the Class a duty of reasonable care in the collection, storage, and protection of their Private Information. That duty arose from, among other sources, (a) Defendant's special relationship with Plaintiff and the Class as the custodian of their Private Information; (b) Defendant's status as a vendor processing FERPA-protected education records on behalf of educational institutions; (c) Defendant's status as a processor of personal information of minor children subject to COPPA and analogous state laws; (d) Defendant's undertaking, through public-facing privacy and security disclosures, to protect such information; (e) Defendant's actual knowledge of the September 2025 Breach and the demonstrated targeting of Defendant by ShinyHunters; and (f) the foreseeable and serious harm to Plaintiff and the Class that would result from a breach.

73.     Defendant breached that duty through, inter alia, its failure to implement and maintain reasonable administrative, physical, and technical safeguards as alleged above, including its failure to remediate after the 2025 Breach.

74.     Defendant's breaches were the actual and proximate cause of the harm suffered by Plaintiff and the Class. Defendant's breaches both increased the likelihood of, and made possible,

23

the Data Breach.

75.    Plaintiff and the Class suffered cognizable injuries as alleged above, including imminent risk of identity theft, lost time, out-of-pocket expenses, diminution in value of their Private Information, and loss of privacy.

76.    The economic-loss rule does not bar Plaintiff's negligence claim because Defendant's duty arises from sources independent of any contract, including statutory and common-law duties to safeguard sensitive personal information of minor children.

## <u>COUNT II</u>

### Negligence Per Se

77.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

78.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), prohibits "unfair . . . acts or practices in or affecting commerce." The Federal Trade Commission has long recognized that a company's failure to maintain reasonable and appropriate data security for consumers' personal information constitutes an unfair act or practice in violation of Section 5.

79.    Defendant's conduct — in particular, its failure to implement and maintain reasonable security measures despite holding the Private Information of approximately 275 million users, including millions of minor children, and despite having been breached only months earlier by the same threat actor — constituted an unfair act or practice in violation of Section 5.

80.    FERPA, 20 U.S.C. § 1232g, and its implementing regulations, 34 C.F.R. Part 99, establish a federal statutory framework requiring that educational records be protected against unauthorized disclosure. Defendant, acting as a "school official" for FERPA purposes pursuant to

its agreements with educational institutions, was bound by FERPA's confidentiality requirements.

81.     Plaintiff, G.S., and the Class are within the class of persons that Section 5 of the FTC Act and FERPA were designed to protect. The harms suffered by Plaintiff and the Class are the kind of harms those provisions were designed to prevent. Defendant's violations of Section 5 and FERPA therefore constitute negligence per se.

82.     The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501–6506, and its implementing regulations, the COPPA Rule, 16 C.F.R. Part 312, establish a federal statutory framework governing the collection, use, retention, and protection of personal information of children under the age of 13 by operators of websites and online services. On April 22, 2025, the Federal Trade Commission published comprehensive amendments to the COPPA Rule, with a final compliance deadline of April 22, 2026. As of that compliance date, every operator subject to COPPA was required, among other things, to "establish, implement, and maintain a written information security program that contains safeguards appropriate to the sensitivity of the personal information collected from children and the operator's size, complexity, and nature and scope of activities," 16 C.F.R. § 312.8(b), to take reasonable steps to ensure that any third party to whom children's personal information is disclosed is capable of maintaining the confidentiality, security, and integrity of that information, and to retain children's personal information only as long as reasonably necessary for the purpose for which it was collected.

83.     Defendant is, and has at all relevant times been, an operator subject to COPPA. Defendant's Canvas platform is used by thousands of K-12 school districts in the United States, and a substantial portion of Defendant's user base consists of children under the age of 13. Defendant has long acknowledged its status as a COPPA-covered operator in its public privacy

disclosures and contractual representations to its educational customers. The Data Breach was discovered on or about April 30, 2026 — just eight days after the amended COPPA Rule's compliance deadline took effect. The very written information security program that the FTC, after multi-year notice-and-comment rulemaking, had concluded was a baseline safeguard for the protection of children's personal information was either not in place at Defendant, was inadequate to its purpose, or was not enforced — as evidenced by the unauthorized exfiltration of 3.65 terabytes of data, including the personal information of millions of children under 13, by the same threat actor that had breached Defendant only eight months earlier. Children under the age of 13 whose personal information was compromised in the Data Breach (members of the Minor Subclass) are precisely the class of persons that COPPA and the COPPA Rule were designed to protect, and the harms suffered by those Class Members — exfiltration of their personal information by criminal actors, with the attendant risks of identity theft, fraud, and exploitation — are precisely the harms that COPPA and the COPPA Rule were designed to prevent. Defendant's violations of COPPA and the COPPA Rule therefore constitute negligence per se as to the under-13 cohort of the Minor Subclass.

84.    Plaintiff does not assert a private right of action under Section 5, FERPA, or COPPA. Plaintiff invokes those provisions solely to establish the standard of care applicable to Defendant's conduct.

85.    Defendant's breaches were the actual and proximate cause of the harm suffered by Plaintiff and the Class. Defendant's breaches both increased the likelihood of, and made possible, the Data Breach.

86.    Plaintiff and the Class suffered cognizable injuries as alleged above, including

26

imminent risk of identity theft, lost time, out-of-pocket expenses, diminution in value of their Private Information, and loss of privacy.

## COUNT III

### Breach of Implied Contract

87.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

88.    Plaintiff, G.S., and the Class entered into implied contracts with Defendant. Through institutional licensing arrangements with educational institutions, Defendant collected Private Information from Plaintiff, G.S., and the Class. As a condition of accessing Canvas — which was, in turn, a condition of accessing their education — Plaintiff, G.S., and the Class provided Private Information to Defendant. In exchange, Defendant impliedly promised to safeguard that Private Information using reasonable measures, to comply with applicable privacy laws, and to provide adequate notice in the event of a breach.

89.    Defendant breached these implied contracts by failing to safeguard the Private Information, by failing to comply with applicable privacy laws, and by failing to provide timely and adequate notice of the Data Breach.

## COUNT IV

### Breach of Confidence

90.    Plaintiff and the Class suffered damages as a direct and proximate result of those breaches.

91.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

27

92.    Plaintiff, G.S., and the Class disclosed Private Information to Defendant in confidence. The confidential nature of that disclosure was understood by both parties and reinforced by Defendant's privacy and security representations and by the FERPA framework governing student educational records.

93.    Defendant assumed a duty of confidentiality with respect to the Private Information. Defendant breached that duty by failing to use reasonable measures to safeguard the Private Information from unauthorized disclosure.

94.    As a direct and proximate result of Defendant's breach of confidence, Plaintiff and the Class suffered damages, including loss of privacy, lost time, out-of-pocket expenses, and diminution in value of the Private Information.

## COUNT V

### Unjust Enrichment

95.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein. This Count is pleaded in the alternative to Plaintiff's contract-based claims.

96.    Defendant received and benefited from the Private Information of Plaintiff, G.S., and the Class. Defendant used that Private Information — directly and as a component of its institutional value proposition — to generate substantial revenues, including through the licensing of Canvas to thousands of educational institutions.

97.    A portion of the consideration paid to Defendant by educational institutions reflected the cost of providing reasonable data security — i.e., security for which institutional licensees paid and which their students were entitled to receive as third-party beneficiaries of those licenses.

28

98.    Defendant retained those benefits while failing to provide reasonable data security. Under the circumstances, it would be inequitable for Defendant to retain the benefits without adequate compensation to Plaintiff and the Class.

## COUNT VI

### Invasion of Privacy – Public Disclosure of Private Facts

99.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

100.    Plaintiff, G.S., and the Class had reasonable expectations of privacy in the contents of their private communications with teachers and classmates conducted through the Canvas Inbox feature, in their student identification numbers, and in the other Private Information collected and stored by Defendant.

101.    Through Defendant's conduct, including its failure to implement and maintain reasonable data security measures, the Private Information of Plaintiff and the Class was disclosed to a criminal threat actor without authorization. The Private Information has been, and is at imminent risk of being, further disclosed publicly by ShinyHunters.

102.    The disclosed information includes private facts that are not of legitimate concern to the public. The disclosure is highly offensive to a reasonable person, particularly given the inclusion of communications generated by minor children in academic settings.

103.    Plaintiff and the Class suffered damages as a direct and proximate result of the unauthorized disclosure.

## COUNT VII

### Declaratory Judgment and Injunctive Relief

29

104.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

105.    Pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, an actual controversy has arisen between Plaintiff and the Class, on the one hand, and Defendant, on the other, concerning Defendant's legal obligations with respect to the Private Information in its custody.

106.    Plaintiff seeks a declaration that: (a) Defendant's data security practices were and are inadequate; (b) Defendant owes a continuing duty to Plaintiff and the Class to implement and maintain reasonable data security; and (c) Defendant must provide individualized notice and long-term credit and identity monitoring to Plaintiff and the Class.

107.    Plaintiff further seeks injunctive relief requiring Defendant to: (a) implement and maintain reasonable data security practices, including those specified above; (b) submit to ongoing third-party security audits; (c) provide credit and identity monitoring services for the Nationwide Class for a period of not less than ten years, and for the Minor Subclass for a period extending at least three years past the age of majority; (d) provide individualized notice to all affected Class Members in plain language; and (e) such other equitable relief as the Court deems just.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, her minor child G.S., and all members of the proposed Class, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A.    An order certifying the proposed Nationwide Class and Minor Subclass under Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representative,

and appointing the undersigned counsel as Class Counsel;

B.     Declaratory relief as set forth in Count VII;

C.     Injunctive relief, including an order requiring Defendant to implement and maintain reasonable data security practices, to submit to ongoing third-party security audits, and to provide individualized notice and long-term credit and identity monitoring services to all affected Class Members, with extended monitoring for members of the Minor Subclass;

D.     An award of compensatory damages in an amount to be determined at trial;

E.     An award of statutory and punitive damages where authorized by law;

F.     An award of restitution and disgorgement of all benefits unjustly retained by Defendant;

G.     Pre-judgment and post-judgment interest at the maximum rate permitted by law;

H.     An award of reasonable attorneys' fees, costs, and litigation expenses, including under the common-fund doctrine, and any other applicable law; and

I.     Such other and further relief as the Court deems just and proper.

## VIII. JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, on behalf of herself, her minor child G.S., and the proposed Class, demands a trial by jury on all issues so triable.

Dated: May 6, 2026

MARSHALL OLSON & HULL, PC

By: */s/ Jason R. Hull*　　　　　　
JASON R. HULL

31

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
BEENA M. MCDONALD*

**CAREY & DANIS, LLC**
JAMES J. ROSEMERGY*

*Attorneys For Plaintiff and Proposed Class*

*\* PRO HAC VICE FORTHCOMING*